# In the Iowa Supreme Court

No. 23–1468

Submitted September 9, 2025—Filed November 14, 2025

**State of Iowa,**

Appellee,

vs.

**Frederick Lee Hawkins III,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Story County, Steven P. Van Marel, district associate judge.

Challenge to the sufficiency of the evidence supporting convictions for assault with intent to commit sexual abuse. **Decision of Court of Appeals Affirmed; District Court Judgment Affirmed in Part, Reversed in Part, and Case Remanded.**

McDonald, J., delivered the opinion of the court, in which Christensen, C.J., and Waterman, Oxley, and May, JJ., joined. Mansfield, J., filed an opinion concurring in part and dissenting in part. McDermott, J., filed a dissenting opinion.

Martha J. Lucey, State Appellate Defender, and Vidhya K. Reddy (argued), Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Zachary Miller (argued), Assistant Attorney General, for appellee.

**McDonald, Justice.**

In a rapid burst of criminal activity spanning minutes, Frederick Hawkins III brazenly assaulted three women in a church. For this conduct, he was charged with and convicted of three counts of assault with intent to commit sexual abuse. The district court sentenced Hawkins to three consecutive two-year terms of incarceration for a total term of incarceration not to exceed six years. In this appeal, Hawkins concedes there was sufficient evidence to establish he had the specific intent to sexually abuse one of the women, but he challenges the sufficiency of the evidence establishing his intent to sexually abuse the other two.

I.

Food at First is a nonprofit organization that offers free daily meals and perishable food distribution services to people in Ames. The organization serves meals out of the basement of the First Christian Church.

On a Friday evening, seventy-eight-year-old M.B. was at the church. While M.B. frequently volunteered for Food at First, she was at the church that night just to visit with people. After dinner had been served, M.B. left to go to work. Carrying two bags of food and a to-go coffee, M.B. walked to the stairs leading from the basement to the first floor. Upon arriving at the enclosed stairwell, M.B. saw a person, later identified as Hawkins, close behind her. She offered Hawkins to go ahead of her, but he declined. When M.B. entered the stairwell and started up the stairs, Hawkins followed "way close." When M.B. reached the top stair before the landing, Hawkins falsely, as a pretext to touch M.B., told M.B. she had "chocolate or something on [her] pants." He began "brushing [her] rear end" with his hand. M.B. said it was "very uncomfortable." She testified that Hawkins then grabbed her "around the waist extremely tight." She said, "Don't. Don't.

Stop. Stop." But the more she tried to get away, the more "his hands were clenching [her] around the waist." Hawkins, while still tightly grasping M.B., started humping her from behind. MB. testified that she "felt his genitals" against her buttocks and that "he had a hard on." She screamed, but "the more [she] screamed, the more aggressive [Hawkins] got." He kept repeating, "Please." Then he forced his hand into her pants, under her underwear, and down to her pubic hairline. M.B. "was afraid [Hawkins] was going to throw [her] on the floor and rape [her]."

Nicholas Vanderhayden, a young man who had walked to the church with Hawkins that night and on several other occasions, then entered the stairwell from the basement. He heard a woman yelling for help. He went up the stairs and found Hawkins "thrusting against" M.B. According to M.B., Vanderhayden said, "Stop it," but Hawkins "kept right on going." M.B. testified Hawkins only "backed off" when C.C., another Food at First volunteer, also came up the stairs and told Hawkins to stop.

C.C.'s recollection of events was slightly different than M.B.'s. As mentioned, C.C. was a volunteer at Food at First. At the time of trial she was sixty-four years old. C.C. testified that when she heard the commotion she went to the stairwell. As she opened the stairwell door from the basement, C.C. saw M.B. descending the stairs. M.B. was "agitated or kind of scared." M.B. stated someone had attacked her. C.C. told M.B. she would escort M.B. to her car. The two women began to ascend the stairs toward the first-floor exit. As they did so, they passed Hawkins on the staircase. C.C. testified that as they passed by Hawkins "slapped" her on her "butt" with his hand. Vanderhayden testified that Hawkins "grabbed" C.C.'s "butt." In either case, C.C. told Hawkins to "stop it."

She and M.B. then ascended the remainder of the stairs, exited the building, and walked to M.B.'s car.

Patricia Yoder, the program director of Food at First, heard the commotion coming from the stairwell. In particular, she heard C.C. yelling. According to Yoder, C.C. never yelled, so Yoder knew it was important. Yoder went up the stairs and saw Hawkins and Vanderhayden at the top of the stairs. She saw M.B. and C.C. outside the main doors of the church "looking quite upset." Yoder went outside to see what had happened. M.B. told her she had just been attacked, and C.C. told her that Hawkins "had slapped her very hard on the behind." Yoder then reentered the church to look for Hawkins.

At around the same time, E.M., another female volunteer who was also in her sixties, reentered the church after taking out the garbage. E.M. rolled the empty garbage can onto an elevator to go from the first floor down to the basement. Hawkins pursued her into the elevator. Yoder saw Hawkins trail E.M. onto the elevator. In her gut, she did not want Hawkins alone with another volunteer, so she headed toward the elevator. As Yoder reached the elevator, she put her arm out to prevent the door from closing. She asked Hawkins to leave. Hawkins told Yoder he had to retrieve his phone from the basement. Yoder then boarded the elevator with Hawkins and E.M. While they were in the elevator, Hawkins ran his hand "from the bottom of [E.M.'s] bottom to the top." E.M. testified that Hawkins's hand went from the top of her legs, up her buttocks, and to the small of her back. While Hawkins was touching E.M.'s buttocks, he said, "Help me. Help me," while holding his "crotch." E.M. found the touching offensive. Yoder started yelling, "Stop that. That's inappropriate. You may not do that." Hawkins then stopped touching E.M. Yoder asked Hawkins to leave the premises.

Hawkins did not leave the premises—instead, he went up the stairs and concealed himself behind a door. Yoder asked an unidentified male volunteer to watch Hawkins while she stepped outside to call the police. Shortly after she called the police, an Ames police officer—Officer Phanchantraurai—arrived at the church. The male volunteer led the officer to Hawkins's hiding spot. The male volunteer summoned Hawkins out from behind the door, saying, "Come out. Come here." The officer then told Hawkins to "sit down. Sit down, sir." Hawkins complied and sat on a nearby bench. The officer told Hawkins he had received a call about Hawkins touching females inappropriately and asked him to explain what happened. Hawkins denied everything. After a second officer arrived at the scene, the officers placed Hawkins under arrest.

Hawkins was charged with three counts of assault with intent to commit sexual abuse for assaulting M.B., C.C., and E.M., in violation of Iowa Code sections 709.1, 709.11(3), and 903B.2 (2022).

Hawkins waived his right to a jury trial, and the case was tried to the district court. At trial, Hawkins did not deny physically assaulting the three women. Instead, he contested whether he had the specific intent to commit sexual abuse at the time of the assaults. First, Hawkins asserted a diminished responsibility defense, claiming that he had a mental health condition that prevented him from forming specific intent. Second, even if he had the capacity to form specific intent, Hawkins contended that there was insufficient evidence to establish he had the intent to commit sexual abuse at the time he assaulted C.C. in the stairwell and E.M. in the elevator.

The district court rejected both of Hawkins's arguments and found him guilty as charged. The district court announced its findings and verdict from the

bench. After correctly reciting the elements of the offenses, the district court found and concluded as follows:

> On Ms. [M.B.], the evidence here is that Mr. Hawkins did follow her up the stairs, he grabbed her buttocks on the way up the stairs. Once they reached the top of the stairs or the landing, he then grabbed her by the waist, pulled her towards him, and rubbed his erect penis against her buttocks, and then put his hand down her pants to her hairline, to her pubic hairline. I think that that was sexual abuse. It was an attempt to commit a sex act.
>
> On Ms. [C.C.], there the evidence is that he grabbed her butt, and the same thing with Ms. [E.M.], is that he grabbed their buttocks. He didn't go to the extent of rubbing himself against the other two women, didn't put his hand down their pants, but I think the evidence here is that that was an act done with the intent to commit a sex act, and it would be sexual abuse.
>
> What it all comes down to in the final analysis here is whether or not when Mr. Hawkins did those acts he had the specific intent to commit sexual abuse, commit a sex act against the will of another person. Obviously we've had a lot of testimony here from psychiatrists and psychologists about whether or not Mr. Hawkins was suffering from a psychotic disorder that would prevent him from forming that specific intent.
>
> First of all, just because he has an -- if he has -- just because somebody has a psychotic disorder, even if Mr. Hawkins has one, doesn't mean you still can't form specific intent. They're not mutually exclusive. Having a psychotic disorder means at times you can't form that specific intent, but it doesn't mean you never can, and here the evidence is pretty thin as to whether or not Mr. Hawkins has a psychotic disorder, especially back in May of 2022, a long time before he was examined by any experts. What I think is telling here is that Mr. Hawkins followed Ms. [M.B.] up the stairs, he first grabbed her on the buttocks, and then he pulled her towards himself and rubbed his erect penis on her buttocks. I think that's pretty clear evidence that he had the specific intent to commit an assault with the intent to commit sex abuse.
>
> And I think on the other two women, if there hadn't been other people around, if he hadn't given up on Ms. [M.B.], that things would have escalated, and he was attempting to assault those two women hoping to commit a sex act against their will, which would be sexual abuse. So, Mr. Hawkins, I do find you guilty of all three counts of assault with intent to commit sexual abuse.

Hawkins timely filed a notice of appeal, and we transferred the case to the court of appeals. The court of appeals affirmed a pretrial ruling denying a motion to suppress Hawkins's statements to the responding officers; affirmed Hawkins's convictions, concluding that substantial evidence supported the findings that Hawkins had the capacity to form specific intent and that Hawkins in fact had the specific intent to commit sexual abuse when he physically assaulted these woman; and remanded the case for resentencing due to a conceded sentencing error.

We granted Hawkins's application for further review. "On further review, we have the discretion to review any issue raised on appeal." *State v. Allen*, 965 N.W.2d 909, 911 (Iowa 2021) (quoting *Burton v. Hilltop Care Ctr.*, 813 N.W.2d 250, 255 (Iowa 2012)). We exercise that discretion in this case to address only Hawkins's claims regarding the sufficiency of the evidence establishing that he in fact had the specific intent to commit sexual abuse when he physically assaulted these women. The court of appeals decision is final as to the pretrial suppression ruling and Hawkins's capacity to form specific intent.

## II.

The standard of review in a challenge to the sufficiency of the evidence is well established. We review the district court's verdict in a criminal case for the correction of errors at law. *See* Iowa R. App. P. 6.907. The district court's findings of fact have the effect of a special verdict, *id.*, and those findings are binding on us if supported by substantial evidence, *State v. Mumford*, 14 N.W.3d 346, 356 (Iowa 2024). Substantial evidence means that quantum and quality of evidence that would convince a rational factfinder the defendant is guilty beyond a reasonable doubt. *See State v. Dible*, 538 N.W.2d 267, 270 (Iowa 1995). In determining whether the district court's verdict is supported by substantial

evidence, we view the evidence in the light most favorable to the verdict. *Id.* This includes all inferences and presumptions fairly drawn from and supported by the evidence. *State v. Fordyce*, 940 N.W.2d 419, 425 (Iowa 2020). "Direct and circumstantial evidence are equally probative" in this regard. *Dible*, 538 N.W.2d at 270. In the end, our review of the district court's verdict is highly deferential: all "[f]indings of the [district] court are to be broadly and liberally construed, rather than narrowly or technically, . . . to uphold, rather than defeat, the judgment." *Id.* We will affirm the judgment of the district court when, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Casady*, 491 N.W.2d 782, 787 (Iowa 1992) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

## III.

Hawkins's challenge in this appeal is limited. He does not challenge the sufficiency of the evidence proving that he physically assaulted M.B., C.C., or E.M. Nor does Hawkins challenge the sufficiency of the evidence supporting his conviction for assault with intent to commit sexual abuse as to M.B., the woman he isolated and humped in the stairwell while forcing his hand down her underwear to her pubic hairline. Instead, he challenges only the sufficiency of the evidence establishing his specific intent to commit sexual abuse against C.C. and E.M. at the time he physically assaulted them.

To convict Hawkins of assault with the intent to commit sexual abuse, in violation of Iowa Code sections 709.1, 709.11(3), and 903B.2, the State was required to prove that Hawkins committed an assault, as defined in Iowa Code section 708.1, with the intent to commit sexual abuse. *See id.* § 709.11. The Code defines "sexual abuse" as any "sex act" done "by force or against the will

of" another. *Id.* § 709.1(1). The Code specifies six forms of sexual contact that constitute a "sex act":

> 1. Penetration of the penis into the vagina or anus.
>
> 2. Contact between the mouth and genitalia or mouth and anus or by contact between the genitalia of one person and the genitalia or anus of another person.
>
> 3. Contact between the finger, hand, or other body part of one person and the genitalia or anus of another person . . . .
>
> 4. Ejaculation onto the person of another.
>
> 5. By use of artificial sexual organs or substitutes therefor in contact with the genitalia or anus.
>
> 6. The touching of a person's own genitals or anus with a finger, hand, or artificial sexual organ or other similar device at the direction of another person.

*Id.* § 702.17.

It is insufficient to show only that the defendant's assault "was for some sex-oriented purpose." *State v. Baldwin*, 291 N.W.2d 337, 340 (Iowa 1980). Instead, the State is required to prove the defendant's assault was committed with the further intent "to achieve a sex act specifically described in section 702.17." *Id.* However, this is not an inchoate offense. The State is not required to prove that the defendant engaged in an overt act toward the commission of sexual abuse beyond the act of assault. Nor is the State required to prove the existence of some intervening force or reason that the defendant did not actually commit the act of sexual abuse after committing the assault.

There is no direct evidence establishing Hawkins's specific intent at the time he physically assaulted C.C. and E.M., but that should come as no surprise. "Specific intent is seldom capable of direct proof." *State v. Ernst*, 954 N.W.2d 50, 55 (Iowa 2021) (quoting *State v. Walker*, 574 N.W.2d 280, 289 (Iowa 1998)). It is the rare case in which a criminal defendant openly proclaims his further intent

while committing his crime. Thus, in the typical case, specific intent must be proved by the totality of "circumstantial evidence and the reasonable inferences drawn from [the totality of the] evidence." *Walker*, 574 N.W.2d at 289; *see also Ernst*, 954 N.W.2d at 53 ("We have long recognized that specific intent crimes are seldom proved by direct evidence of the defendant's intent, leaving the State to rely on inferences to be drawn from the surrounding circumstances . . . ."); *State v. Robinson*, 859 N.W.2d 464, 481 (Iowa 2015) ("In the end, the [sufficiency-of-the-evidence] question calls for an exercise of our judgment as to whether, on the totality of the circumstances, the State offered sufficient evidence that a jury could find beyond a reasonable doubt that the" elements of the crime were satisfied.); *State v. Radeke*, 444 N.W.2d 476, 478–79 (Iowa 1989) (stating the defendant "will generally not admit later to having the intention which the crime requires . . . his thoughts must be gathered from his words (if any) and actions in light of surrounding circumstances" (omission in original) (quoting Wayne R. LaFave & Austin W. Scott, Jr., *Handbook on Criminal Law* § 3.5(f), at 226 (2d ed. 1986))).

With respect to circumstantial evidence probative of specific intent to commit sexual abuse, we may consider the "facts surrounding the assault." *Casady*, 491 N.W.2d at 787 ("One could infer from Casady's behavior that he harbored a wrongful intent of some kind when he assaulted S.O."). We have explained that evidence of intent to commit sexual abuse could be shown by an "overt act" towards the accomplishment of that objective. *Radeke*, 444 N.W.2d at 478 (quoting *State v. Maynard*, 379 N.W.2d 382, 383 (Iowa Ct. App. 1985)). However, the commission of an overt act is only one of many facts and circumstances that could be relevant to establishing intent. As noted above, the commission of an overt act is not an element of assault with intent to commit

sexual abuse. A defendant can commit the offense without evidence of any overt act beyond an assault. For example, in this case, if Hawkins had admitted to the officers that at the time he assaulted C.C., he also had the further intent to touch her genitalia or anus with his hand, that would be sufficient to prove the offense.

Of course, Hawkins did not make such an admission in this case, so we must look at all of the other facts and circumstances surrounding this entire criminal episode. Particularly relevant here is the relationship between the three assaults. When a criminal defendant commits similar acts close in time and place, the defendant's intent as to one victim may be probative of the defendant's intent with respect to the other victims. *See State v. Cox*, 781 N.W.2d 757, 771 (Iowa 2010) (stating "[t]here are numerous ways in which prior sexual abuse of one other than the victim may become relevant to motive or intent" in resolving a challenge under Iowa Rule of Evidence 5.404(*b*)); *State v. Spargo*, 364 N.W.2d 203, 210 (Iowa 1985) ("Inasmuch as [another victim's] testimony was properly admissible, such evidence of defendant's pattern of prior acts with young boys that resulted in sex acts when coupled with defendant's acts toward John including running his hand over John's chest and groin area and telling him he loved him, cause us to conclude that there is sufficient evidence in the record to support a finding that defendant's intent on the night of January 8 was to engage in a sex act with John.").

For example, in the very similar case of *State v. Vickers*, the defendant was convicted of sexually assaulting two women shopping in a store. 326 A.3d 287, 291 (Conn. App. Ct. 2024). As to the first woman, the defendant "pinned her against a shoe rack with one hand while using his other hand to attempt to take her purse. After [the woman] dropped her purse, the defendant lifted her dress, pulled down the shorts she was wearing underneath, and touched her buttocks,

vaginal area, and breast." *Id.* at 292. After a shopper intervened, the defendant ceased the assault and "briskly walked toward another area of the store." *Id.* A few moments later, the defendant walked behind a different woman and "reached out and grabbed her buttocks." *Id.* The court affirmed the convictions with respect to each woman. *Id.* at 291. The court explained that sexual assault was a specific-intent crime and that the circumstances surrounding both assaults "was relevant to establish the defendant's intent with respect to each sexual assault." *Id.* at 299. "[E]vidence of the assault of [one victim] further demonstrated that the defendant possessed the necessary intent with respect to [the other victim]." *Id.* at 300. Stated differently, the evidence relating to both assaults, together, "had the tendency to make it more probable that the defendant committed the crimes against each victim." *Id.*

In *State v. Diaz*, the defendant waited outside the same bar on consecutive weekends. 349 P.3d 1220, 1124 (Idaho Ct. App. 2015). On the first weekend, he followed an intoxicated woman walking home from the bar. *Id.* After following the woman for a period of time, the defendant "chased the victim, tackled her to the ground, straddled her, and pinned down her arms. [He] began manipulating his waistband area and the victim screamed for help, drawing the attention of at least one resident in the area." *Id.* The defendant then punched the victim and fled. *Id.* On the second weekend, the defendant again followed an intoxicated woman leaving the bar. *Id.* The woman began to run, and the defendant chased her, "grabbing her just as she reached her sister's house. She shoved him, breaking free from his grip, and ran to the door. She rang the doorbell and [the defendant] fled." *Id.* The defendant was charged with and convicted of battery with intent to commit rape and assault with intent to commit rape. *Id.* The court concluded that the circumstances surrounding "the battery count [were] 'very

important' to establishing the necessary element of specific intent in the assault case." *Id.* at 1227. The defendant's "conduct during the battery—poking the victim's genitals, tackling her, straddling her, and manipulating his waistband area—is potent evidence of his specific intent to commit the serious felony of rape not only during that incident, but also during the assault." *Id.* The court reasoned that "the two crimes were very similar. Not only were the crimes committed just days apart and in the same location, but the similarity in their manner of commission was striking." *Id.*

In light of the foregoing, we conclude there was substantial evidence for the district court to conclude that Hawkins had the specific intent to commit sexual abuse when he assaulted M.B. and E.M. Hawkins isolated M.B. in a stairwell, grabbed her, humped her, rubbed his erection against her buttocks, touched her genitalia with his fingers under her underwear, and stopped only when C.C. intervened. *See Baldwin*, 291 N.W.2d at 340 (defining genitalia as the reproductive organs); *State v. Martens*, 569 N.W.2d 482, 486 (Iowa 1997) ("[P]ubic hair is included in the term 'genitalia' and is a part of the 'genitalia area' "). With respect to E.M., Hawkins rubbed his hand from the top of her legs, up her buttocks, to the small of her back. He uttered, "Help me. Help me," while touching his crotch, which a reasonable finder of fact could infer was a request to help Hawkins satisfy his further sexual urges.

Sandwiched only a few moments before and after these two assaults was Hawkins's physical assault of C.C. Given that the evidence of Hawkins's three assaults considered together was relevant to Hawkins's intent as to each assault, we conclude the totality of the evidence supported an inference that Hawkins acted under the same impulse and with the same specific intent when he assaulted C.C. as when he assaulted M.B. moments before and E.M. only a few

minutes later. *See Cox*, 781 N.W.2d at 771; *Vickers*, 326 A.3d at 300; *Diaz*, 349 P.3d at 1227; *People v. Demetrulias*, 137 P.3d 229, 240–41 (Cal. 2006) (holding that a jury could rationally infer a defendant "harbored the same criminal intent" with respect to two separate victims where the assaults occurred on the same night). The three assaults constituted a single criminal episode. They occurred in rapid succession over only a few minutes. Each was perpetrated in an enclosed, relatively isolated area of the same church building. Each was committed against the same type of victim. And Hawkins implausibly denied committing any of the offenses when interviewed by the officers at the church. *See State v. Cox*, 500 N.W.2d 23, 25 (Iowa 1993) (noting the implausibility of the defendant's story along with false statements to officers supports an inference of guilt). Hawkins's specific intent as to each was probative of his specific intent as to all.

The dissent argues that there is insufficient evidence to sustain the convictions because the State failed to prove that Hawkins committed an overt act intended to complete the act of sexual abuse that was thwarted by an external interruption. Hawkins does not advance this argument, most likely because it is a misstatement of the controlling law. The dissent misapprehends the elements of the offense. Assault with intent to commit sexual abuse is not an inchoate offense. The plain text of Iowa Code section 709.11 requires only two elements: (1) an assault, and (2) the specific intent to commit sexual abuse at the time of the assault. The Code does not require proof that the defendant took a substantial step toward committing sexual abuse or proof that the defendant was interrupted before committing sexual abuse. Our caselaw discussing a defendant's overt act toward committing sexual abuse describes only one powerful form of circumstantial evidence from which specific intent can be

inferred. Our caselaw does not preclude the use of other evidence to establish specific intent. The ultimate question is simply whether the totality of the circumstantial evidence is sufficient for a rational factfinder to find specific intent beyond a reasonable doubt. There is sufficient evidence in this case.

While it is true that a reasonable finder of fact may have reached a different conclusion with respect to the assaults against C.C. and E.M., that is not material to the question before us. It is well-established that "[e]vidence is not insubstantial merely because we may draw different conclusions from it; the ultimate question is whether it supports the finding actually made, not whether the evidence would support a different finding." *State v. Lacey*, 968 N.W.2d 792, 800–01 (Iowa 2021) (quoting *Brokaw v. Winfield–Mt. Union Cmty. Sch. Dist.*, 788 N.W.2d 386, 393 (Iowa 2010)).

IV.

For these reasons, we affirm the defendant's convictions for assault with intent to commit sexual abuse. The defendant contends the district court abused its discretion in failing to provide its reasons for imposing the sentences consecutive to each other. The State concedes the error. We thus vacate the defendant's sentence. Because this sentencing error involves a carceral sentence, we remand this matter for a plenary sentencing hearing. *See State v. Duffield*, 16 N.W.3d 298, 304 (Iowa 2025).

**Decision of Court of Appeals Affirmed; District Court Judgment Affirmed in Part, Reversed in Part, and Case Remanded.**

Christensen, C.J., and Waterman, Oxley, and May, JJ., join this opinion. Mansfield, J., files an opinion concurring in part and dissenting in part. McDermott, J., files a dissenting opinion.

**Mansfield, Justice (concurring in part and dissenting in part).**

I agree that Frederick Hawkins's convictions on counts I and III should be upheld. I dissent as to count II.

I'm persuaded by several of the legal points raised in Justice McDermott's dissent. That is, I agree that the relevant issue is whether the defendant intended to commit sexual abuse against the victim under the facts *as they were*, not whether the defendant would have intended to commit sexual abuse *if the facts had been different*. Further, at the time of the assault, the law requires an intent to commit sexual abuse against the victim, not merely a disposition toward crude and predatory behavior.

However, when I apply that law to the facts of the present case, I find sufficient evidence to sustain Hawkins's convictions on both count I and count III. In my view, the evidence falls short only as to count II.

To recap, with respect to count I, the trial record shows that Hawkins grabbed M.B. in a stairwell, started humping her from behind while his penis was erect, ignored her screaming, and forced his hand under her pants and underwear. All this continued until Hawkins was interrupted by a third person telling him to stop. M.B. testified that she was afraid she was going to be raped. Clearly, there was enough evidence to establish assault with intent to commit sexual abuse on count I.

The events of count III took place a few minutes later. Hawkins pursued E.M. into the elevator, ran his hand up her buttocks, and said, "Help me. Help me," while holding his "crotch." Again, Hawkins relented only when a third person told him to stop. I believe a reasonable jury could find that Hawkins

committed his offensive touching of E.M. with the intent to continue onward to sexual abuse.

Finally, count II took place temporally between count I and count III. C.C. was escorting a shaken M.B. up the stairs and toward her vehicle so she could leave the premises. They had to pass Hawkins. According to C.C., Hawkins slapped C.C. on the buttocks as the two women went by. (According to another witness, Hawkins "kind of grabbed" C.C.'s "butt," but C.C. characterized what happened as a slap.)

I agree with Justice McDermott that there was insufficient evidence that Hawkins intended to sexually abuse C.C. when he slapped her buttocks as she walked by on the staircase. The majority says that a jury could infer that "Hawkins acted under the same impulse and with the same specific intent when he assaulted C.C. as when he assaulted M.B. moments before and E.M. only a few minutes later." But that isn't quite right. A jury would have to infer that Hawkins had the *separate* specific intent to sexually abuse C.C. at the time he slapped her buttocks as she walked by. I don't see that on this record.

For the reasons stated, I concur in part and dissent in part.

**McDermott, Justice (dissenting).**

For each crime charged in this case, the State had to prove that the assault was committed "with the intent to commit sexual abuse." Iowa Code § 709.11 (2022). Sexual abuse, in turn, consists of a "sex act" committed by force or against the victim's will. *Id.* § 709.1(1). The State thus needed to prove that at the time Hawkins improperly touched each woman, he *also* intended to go on to commit a sex act by force or against the will of each woman. Because the record lacks support to find such an intent on counts II and III, I must respectfully dissent.

In determining whether the record offers proof beyond a reasonable doubt of Hawkins's intent to commit a sex act, we necessarily look to the degree and character of his overt acts. "[A defendant] will generally not admit later to having the intention which the crime requires . . . his thoughts must be gathered from his words (if any) and actions in light of surrounding circumstances." *State v. Radeke*, 444 N.W.2d 476, 478–79 (Iowa 1989) (omission in original) (quoting Wayne R. LaFave & Austin W. Scott, Jr., *Handbook on Criminal Law* § 3.5(f), at 226 (2d ed. 1986)). As we have repeatedly said,

> The overt act must reach far enough towards the accomplishment, toward the desired result, to amount to the commencement of the consummation, not merely preparatory. It need not be the last proximate act to the consummation of the offense attempted to be perpetrated, but it must approach sufficiently near it to stand either as the first or some subsequent step in a direct movement towards the commission of the offense after the preparations are made.

*State v. Roby*, 188 N.W. 709, 714 (Iowa 1922); *see also Radeke*, 444 N.W.2d at 478 (same quote); *State v. Casady*, 491 N.W.2d 782, 787 (Iowa 1992) (en banc) (same quote). As elaborated below, our cases suggest that overt acts revealing an intent to commit sexual abuse generally fall into one of two categories:

(1) multiple acts of a sexual nature that, until some interruption, demonstrate a clear progression toward committing a sex act; or (2) a preparatory act that, until some interruption, was strikingly similar to a preparatory act that preceded the defendant's prior attempt or commission of a sex act. Under either category, an interruption or some other change in circumstance is a necessary ingredient because it answers the obvious question: *if the defendant intended to commit a sex act, what stopped him?* The majority's opinion does not—and cannot— answer that question for counts II and III because no interruption occurred to prevent Hawkins from carrying out his alleged intent to commit a sex act.

In reviewing a challenge to the sufficiency of the evidence after a conviction, we consider the evidence in the light most favorable to the State. *Radeke*, 444 N.W.2d at 477. The central question is whether any rational trier of fact could have found beyond a reasonable doubt that the defendant intended to commit a forcible sex act. *Id.* The definition of "sex act" makes clear that it involves far more extreme actions than a slap or brief slide of the hand up someone's clothed buttocks, and instead requires actions such as "[p]enetration of the penis into the vagina or anus" or "[c]ontact between the finger, hand, or other body part of one person and the genitalia or anus of another person." Iowa Code § 702.17(1), (3). Hawkins's improper physical touches constitute assault, but they do not support the further conclusion that he planned to go on to engage in a far more serious forcible "sex act" with either woman.

In *State v. Roby*, we considered whether sufficient evidence supported the defendant's conviction for assault with intent to commit statutory rape. 188 N.W. at 714. Trial testimony disclosed that the defendant signaled to meet the fourteen-year-old victim in the bushes behind her garage while her parents were not home. *Id.* at 710–11. After separately arriving at the bushes, the events

unfolded as follows: first they sat together on a railroad tie talking, then the defendant put his arms around her, then they moved to the ground together and laid closely beside one another, and then "acts of familiarity by both, and a request by defendant." *Id.* At that point, "a neighbor lady, Mrs. Chaplin, discovered the two in the position described" and appeared before them, putting an end to things. *Id.* at 711.

In finding sufficient evidence supporting the intent element of the crime, we concluded that the evidence contained "not only one, but numerous, overt acts—preliminary steps in preparation for sexual intercourse." *Id.* at 714. We catalogued as overt acts, among others, the defendant's signaling to meet at the secluded place, his fondling of the victim, the "disarrange[ment]" of the victim's clothing, and their position lying alongside one another. *Id.* But we cautioned against drawing conclusions about intent in cases where the overt acts do not reach this far: "[M]ere acts of preparation not proximately leading to the consummation of the intended crime will not suffice to establish an intent to commit it," we declared, since "there must be some act moving directly toward the commission of the offense after the preparations are made." *Id.* On the facts presented, however, we took the view that "doubtless the next step would have been the last and only remaining act to be done but for the appearance of" the neighbor. *Id.*

*State v. Radeke* is similar. 444 N.W.2d 476. There, the defendant made an appointment with a female real estate agent to see a remote rural property. *Id.* at 477. During the showing, the defendant got behind the agent, covered her mouth with his hand, grabbed her around the waist, and instructed that if she did as told, he would not hurt her. *Id.* When the defendant told the agent to unbutton her blouse, she complied, but she was then able to pull away from

him. *Id.* Once free from his grasp, the agent told the defendant that her office knew where she was and that the property owner was on his way home, prompting the defendant to apologize and leave. *Id.* at 477–78.

The defendant in *Radeke* argued that the state failed to present evidence of his intent to commit sexual abuse. *Id.* at 477. We affirmed his conviction, concluding that the series of overt acts demonstrated an intent to force himself upon the agent. *Id.* at 478–79. Beyond the considerable physical contact that the defendant made with the victim, we noted evidence of the defendant's insistence that the female agent (and not the property's owner) conduct the showing; that the victim ended the encounter only by escaping from his grasp and indicating that help was on the way; and of numerous lies that the defendant told throughout the interaction to mask his criminal intentions (that he was employed, that his company would be paying the purchase price, that he was married with children, and giving a false name). *Id.* at 478.

But in this case, we lack similar overt acts on counts II and III showing that Hawkins was "moving directly toward the commission" of a forcible sex act. *Roby*, 188 N.W. at 714. Consider Hawkins's misconduct with M.B., which offers numerous overt acts to establish his unlawful intent under count I: following her into the secluded stairwell, falsely claiming that she had chocolate on her pants in an attempt to justify rubbing her buttocks, forcibly pulling her against his body with both hands, not stopping when she ordered him to stop, and reaching his hand beneath her pant waistline and underwear to her pubic hairline. M.B. testified that before the others entered, she thought Hawkins was going to rape her. Contrast this with counts II and III, where we have (in count II) only a slap on the buttocks as C.C. walked past and (in count III) only a brief upward touch of the hand from the bottom to the top of E.M.'s buttocks, with no other attempt

to do anything with or to either of them. Neither encounter occurred in a secluded area; neither encounter involved pulling the victim against his body or against his genitals; neither encounter involved reaching into any clothing; neither encounter involved further action after he had been told to stop; neither victim testified to having any concern that the assault might progress further (with E.M. saying that she was not scared during the interaction but that "it was just, like, you know, this isn't right").

In *State v. Casady*, we recognized a *modus operandi* category of overt acts in finding sufficient evidence for intent to commit sexual abuse based on the defendant's conduct in two prior sexual assault convictions. 491 N.W.2d at 785. In *Casady*, the defendant approached a woman while in his car, lured her to his window, and grabbed her arms in an unsuccessful attempt to pull her through the window and inside the car. *Id.* at 786–87. The defendant argued that there was insufficient evidence of sex-directed activity to support his conviction. *Id.* But we found this assault "equally similar" to a prior crime that the defendant committed where he lured victims to his car by holding up a piece of paper so victims had to lean into the car to see it, grabbing the victims by the arms, pulling them through the passenger window, and sexually abusing them. *Id.* at 788. We said that "[t]he modus operandi was clearly parallel; the trial court could reasonably infer that if [the victim] had not escaped, Casady would have continued with his plan and committed sexual abuse." *Id.*[1]

But Hawkins's case involves neither "equally similar" conduct nor "clearly parallel" modus operandi evidence. Unlike in *Casady*, the circumstances in

---

[1]And even in *Casady*, where, unlike here, the crimes were virtually identical, the court was still divided. Finding evidence of overt acts toward an intent to commit sexual abuse lacking, three justices dissented in *Casady*, accusing the majority of "us[ing] evidence of defendant's past bad acts to fill the admitted void in the evidence as to defendant's intent in the present case." 491 N.W.2d at 789 (McGiverin, C.J., dissenting).

counts II and III do not suggest that Hawkins was following a playbook toward the commission of a forcible sex act that was interrupted before he could commit the crime. Just as this case is missing evidence of overt acts suggesting a sex act was imminent, it likewise is missing evidence of a modus operandi that Hawkins was set on following until some interruption. The interruption that thwarted his pursuit of a sex act against M.B.—the presence of others coming into the stairwell—was *always there* with both C.C. (through the ongoing presence of Nicholas Vanderhayden and M.B.) and E.M. (through the ongoing presence of the executive director who was speaking to and (in her words) "literally looking directly at" Hawkins in the elevator when he touched E.M.). The majority offers no explanation for why, if Hawkins really had an intent to commit a forcible sex act, he did not follow through against the victims in counts II and III.[2]

Our precedents recognize that this piece of the puzzle—a change in circumstances thwarting the sex act that the defendant intended to commit—is integral to the finding of intent. In *Roby*, we found that it was the arrival of the neighbor that prevented the sex act: "Defendant had arrived at the last state of the proceedings, and doubtless the next step would have been the last and only remaining act to be done but for the appearance of Mrs. Chaplin." 188 N.W. at 714. In *Radeke*, we found that it was the victim's declaration that help was on the way: "A jury could infer that [the victim's] statements made [the defendant]

---

[2]The majority largely relies on two intermediate appellate court decisions from other states as authority for its decision. The first case, from the Connecticut Appellate Court, *State v. Vickers*, focuses on the unrelated issue of whether evidence of different incidents of assault was admissible in a defendant's challenge to the district court's denial of a motion to sever trial on two different assault charges. 326 A.3d 287, 299–301 (Conn. App. Ct. 2024). The second case, from the Idaho Court of Appeals, *State v. Diaz*, involves modus operandi evidence based on two virtually identical attempts to sexually assault intoxicated women leaving a particular bar on consecutive weekends. 349 P.3d 1220, 1227 (Idaho Ct. App. 2015). The dissimilarities in Hawkins's separate interactions with M.B., C.C., and E.M. offer no modus operandi evidence, making the *Diaz* case readily distinguishable.

so fearful of discovery that he then chose to leave rather than to sexually assault her." 444 N.W.2d at 478. In *Casady*, it was the victim's escape from the defendant's grasp: "[T]he trial court could reasonably infer that if [the victim] had not escaped, Casady would have continued with his plan and committed sexual abuse." 491 N.W.2d at 788. Even here, in the undisputed assault with the intent to commit a sex act against M.B., the majority recognizes the importance of the changed circumstance, stating that "Hawkins . . . stopped only when C.C. intervened."

In explaining the convictions on counts II and III, the district court stated: "And I think on the other two women, [C.C. and E.M.,] if there hadn't been other people around, if he hadn't given up on [M.B.], that things would have escalated, and he was attempting to assault those two women hoping to commit a sex act against their will, which would be sexual abuse." With M.B., the assault occurred while Hawkins was alone in the stairwell with her and only stopped when others entered. With both C.C. and E.M., other people were present from the start. We cannot create a counterfactual, as the district court did, about what Hawkins might have hoped *had no one else been present.* We must instead consider whether—under the actual conditions existing when Hawkins touched C.C. and E.M.—he also in fact intended at that moment to go on to commit a forcible sex act against each one.

For its part, the majority assumes that the intent to sexually abuse M.B. carried over to Hawkins's interactions with C.C. and E.M. According to the majority, "[t]he three assaults constituted a single criminal episode," supporting the conclusion that "Hawkins acted under the same impulse and with the same specific intent" when he assaulted C.C. and E.M. as when he assaulted M.B. Yet whereas in prior cases we looked to similar plans with similar execution, the

majority here fixes on the fact that the incidents were close in time. But proving intent requires more than showing merely an urge or impulse to do some act; it requires proof that a person had "the mental resolution or determination to do it." *Intent, Black's Law Dictionary* 963 (12th ed. 2024).

The majority's focus on temporal connection misses the key differences in the settings in which Hawkins interacted with each woman and how that affected his conduct toward each. Are we really to conclude that Hawkins planned to commit a forcible sex act against C.C. while she escorted M.B. up the stairs, with two bystanders present? Or against E.M. during a brief one-floor elevator ride, on an elevator whose doors opened into the busy dining hall, with the nonprofit's executive director standing next to him and talking to him? Unlike in *Roby*, *Radeke*, and *Casady*, where the assaults ended in a manner unplanned by the defendants, there was no unplanned ending that terminated Hawkins's interactions with C.C. and E.M. There was no interruption, no intervening bystander, and no change in circumstances thwarting an intended sex act.

"The mere instinct or hunch that [a defendant] intended to sexually abuse [another] is insufficient to support a finding of guilt beyond a reasonable doubt." *Casady*, 491 N.W.2d at 787. A hunch about what *might* have happened had no one else been present doesn't amount to proof that Hawkins actually intended to carry out a forcible sex act under the circumstances as they existed.

The law doesn't criminalize bad thoughts; criminal liability attaches only where the state can prove sufficient overt acts to establish that someone intended to put those bad thoughts to action. Hawkins's convictions under counts II and III are drawn from speculation about what *might have happened* had the facts been different. The facts here come not close, in my view, to establishing beyond a reasonable doubt that at the time he improperly touched C.C. and E.M., he

further intended to go on to commit forcible sex acts against them. I would reverse Hawkins's convictions on counts II and III, remand for entry of an amended judgment of conviction for simple assault on these counts, and require resentencing.